**Eddie B. SWANS, Sr., as Personal Representative of the Estate of Edward Swans, Deceased, Plaintiff,**

v.

**CITY OF LANSING, et al., Defendants.**

**No. 5:96–CV–56.**

United States District Court,
W.D. Michigan,
Southern Division.

Nov. 9, 1998.

Mark R. Bendure, Bendure & Thomas, Detroit, MI, •Geoffrey N. Fieger, Fieger, Fieger & Schwartz, PC, Southfield, MI, for Plaintiff.

Michael S. Bogren, Plunkett & Cooney, PC, Kalamazoo, MI, Mary Massaron Ross, Plunkett & Cooney, P.C., Detroit, MI, for Defendants.

## *OPINION*

ENSLEN Chief Judge.

This matter is before the Court on Defendants' Motion for Remittitur, Motion for New Trial, Motion for Judgment as a Matter of Law and Plaintiff's Motion for Costs and Attorney Fees. The Court addresses these Motions in the context of the evidence heard by the jury at trial.

## *I. Summary of Trial Testimony*

This case was tried to a jury over twenty-seven days. The jury heard, saw, and touched extensive evidence, including hundreds of documents, photographs, videotape, physical restraints, autopsy reports, the lay and expert testimony of over 30 witnesses, and site visits to the Lansing City Jail, the Volunteers of America homeless shelter and King's Kids Day Care Center. The jury was charged by the Court and after two days of deliberations reached its verdict on April 15, 1998. The jury's verdict found for the Plaintiff and against the Defendants as follows: against all Defendants, jointly and severally, for actual damages in the amount of $9,800,-000.00 and against the individual Defendants individually for punitive damages in the following amounts: Michael Mezzano, $1,000,000.00; Miklos Szilagyi, $500,000.00; Glenn Sherman, $275,000.00; Joseph Diaz, $275,000.00; William Fabijancic, Jr., $275,-000.00; Kevin Moore, $275,000.00; Patricia

Layne, $225,000; and Donald Viele, $300,-000.00.

■ Defendants have filed Motions to reduce or set aside the jury's verdict. The Motions require consideration of the evidence and argument at trial in a light most favorable to the Plaintiff. *Williams v. Nashville Network*, 132 F.3d 1123, 1130 (6th Cir.1997). Considering the evidence at trial in a light most favorable to the Plaintiff, the evidence at trial established the following events:

On February 2, 1996, Edward Swans was a middle-aged, 5'8", 260-pound, African–American man with a record of honorable service in the military and an honorable discharge with a partial service-related disability of schizophrenia. (Trial Testimony at 10–42, 16–30.) According to his family, when Edward Swans' condition was treated with medication, he functioned normally. (T.T. at 16–31) When untreated, he did not. (*Id.*) As a consequence, prior to February 2, 1996, he had a history of multiple hospitalizations with the Veteran's Administration and a history of arrests in the City of Lansing.

On the morning of February 2, 1996, at 5:00 a.m., Edward Swans appeared at the third floor of the Lansing City Jail, complaining of an assault. At the time, the weather was extremely cold with a 27–degree below zero wind chill (F.). (T.T. at 5–152.) Edwards Swans presented himself not wearing a shirt, coat or socks. (T.T. at 5–186.) Officer James Thornburg questioned Swans' story about being assaulted and thrown out of his house, saying "you walking that distance (three miles).... I'm surprised you're alive." (T.T. at 5–187.) To which Swans replied, "I have Jesus in my heart." (*Id.*) His complaint was deemed "unfounded" by Officers Fred Tabor and Thornburg. (T.T. at 5–189.) At that time, Swans pleaded to "go to jail" but was instead given a shirt and taken to Volunteers of America ("VOA") for breakfast at approximately 6:00 a.m. (T.T. at 5–189 to 5–191.) Before taking Swans to the VOA, officers gave him a preliminary breath test, which tested at .036. (T.T. at 5–177.)

According to Steven Souza (an addiction counselor for VOA), upon Swans' entry to VOA, he reeked of alcohol, was uneasy, anxious, manic, disoriented, irrational and confused. (T.T. at 10–8, 10–12 to 10–15.) Swans during his stop at VOA had contact with case manager Robert Lindley, who described Swans on that day as "not having all his marbles." (T.T. at 10–44.) Swans apparently desired at that time to be taken to the Veteran's Hospital in Battle Creek and acted as if a van might be taking him to the hospital, though one was not so scheduled. (*Id.*) He left VOA at 10:15 a.m. after the van had failed to appear. (T.T. at 10–48.)

At 11:00 a.m. that morning, Edward Swans entered the King's Kids Day Care Center on 2003 West Main apparently to use their telephone and warm himself. (T.T. at 20–197.) The Day Care was located close-by to a residence or former residence of Edward Swans. The location is approximately three miles from the Lansing City Lockup. (T.T. at 16–188.) According to operator of the Day Care, Ann Benson, Swans had "a wild look." (T.T. at 20–197.) According to her, he had icicles hanging from his nose and was without a coat (though not much later he was seen by her wearing a coat). (T.T. at 20–220.) He then left the building, picked up a pickaxe and was seen talking to himself. (T.T. at 20–201.) Swans began knocking at the door with the pickaxe at which time the police were summoned by 911 call of a Day Care worker. (Exhibit 48A; T.T. at 6–69.) Over the 911 call, the worker complains of a man with a pickaxe who is "kind of crazy." (Exhibit 48A.) Officer Donald Viele, Officer David Dickson and Detective William Debnar, in that order, arrived at the address. (T.T. at 16–143 to 16–144.) One of the officers responding to the call describes the suspect over the radio as a "10–96." (*Id.*) The 10–96 code, according to officers of the Department, refers to a mental patient or person who is otherwise

"whacked out there." (T.T. at 6–70.) Upon his arrival, Officer Viele stopped Swans and obtained identification from Swans' wallet. (T.T. at 16–149, 20–204.) Swans' wallet included identification cards among them a card identifying Swans as a Veteran's Administration patient and instructions to call Mrs. Swans. (Exhibit 73; T.T. at 16–176 to 16–178.) Swans then ran and was pursued by officers. According to Officer Dickson, he ordered Swans to stop and arrested Swans for failing to obey a lawful order, assaulting an officer (for kicking Officer Viele) and resisting arrest. (T.T. at 11–169 to 11–170.) Dickson described Swans as confused, disoriented and as having foam coming from his mouth. (Exhibit 8; 11–171 to 11–172.) Viele then transported Swans to the Lansing City Jail, during which time Swans "talked to God." (T.T. at 16–186 to 16–187.)

Upon arrival at the Jail, Detention Officer Joseph Diaz attempted to book Swans at the desk. (T.T. at 16–177 to 16–178.) Swans had several previous contacts with detention staff (including Detention Officers Diaz, Fabijancic, Sherman and Layne) relating to earlier bookings. (T.T. at 17–193, 1–197 to 17–198.) During at least one of these contacts, it was entered on the Police Department computer that Swans took Thorazine. (T.T. 11–85.) At the time of anticipated booking, Swans was handcuffed with his hands behind his back. (T.T. 17–206.) The computer was not checked at the time of Swans' booking. (T.T. at 17–204 to 17–205, 12–181.) Swans uttered words to the effect "you're going to shoot me" and then stood silent. (T.T. at 10–109, 10–187, 6–66.) Swans was told by Officer Diaz to face either the booking counter or the cage behind him. (T.T. at 17–210.) When he shook his head "no," Diaz grabbed his arm and attempted to move him toward the booking counter. (*Id.*) In the process, Swans was moved against the cage. (T.T. at 10–110.) Detention Officers Kevin Moore, William Fabijancic, and Sergeant Miklos Szilagyi then entered the booking area and with Diaz responded to an order of one of the officers to "take him down." (T.T. at 10–110.)

Upon Swans being taken down, his foot struck Sgt. Szilagyi in the face. (T.T. at 10–115.) From that point forward, Detention Office Fabijancic used, in his own words, "pain compliance" techniques to subdue Swans. (T.T. at 17–60.) Officer Fabijancic used wrist locks, transport wrist locks, hypoglossal pressure (pressure under the chin), mandibular angle pressure (pressure with the thumb behind the ear), bronchial plexus clavicle notch pressure (pressure to a nerve around the shoulder blade), and infraorbital pressure (pressure on a nerve near the nose) to obtain compliance. (T.T. at 17–58, 17–64, 17–72, 17–83.) According to Fabijancic, his use of these techniques was approved by his Department. (T.T. at 17–83 to 17–84.) According to some of the officers, they attempted to place Swans in a restraint chair in the 6 cell block in accordance with Department policy of using force based on a continuum of force and necessity. This claim, however, was contradicted at trial by the short duration of time that officers had for use of the restraint chair. (T.T. at 10–122.) It was further contradicted by the fact that Officer Dickson, who visited the cell block after the alleged use of the restraint chair, testified that there was no chair in the cell block. (T.T. at 11–159 to 11–160.)

In any event, the officers involved agree that what followed was the use of their "kick—stop restraint" mechanism on Edward Swans. The kick-stop restraint is a method of restraining a prisoner with legs and arms tied behind the prisoner's back to a strap on the prisoner's waist. According to Officer Diaz, the City of Lansing had used such methods of prisoner restraint on hundreds of prisoners in the Jail over a six-year period. (T.T. at 18–26.) According to the manufacturer of the kick-stop restraint system, prisoners on whom the device is used should not be placed face-down due to the risk of suffocation. (T.T. at 17–145; Exhibit 78; Exhibit 64.) Nevertheless, the Betamax videotape showing the application of the kick-stop restraint in cell 6–2, which began to run at

11:46:40 a.m., shows Edward Swans face-down as six officers (Mezzano, Sherman, Fabijancic, Diaz, Layne and Moore) apply the kick-stop restraint. (Exhibit 46; Dkt. No. 172; 10–73 to 10–76.) The tape, interpreted in a light most favorable to the Plaintiff, shows the six detention officers applying extreme restraints and placing their weight on Swans while he is handcuffed, tied and lying on his stomach. During the restraint, Officer Viele enters the 6 cell block to "open the window." (T.T. at 16–125.) The tape, interpreted in a light in favor of the Plaintiff, does not show Swans opposing the use of force. From 11:47:13 a.m. to 11:47:40 a.m., a large officer who is standing and supervising, Lt. Mezzano, places his foot and the weight of his body on Swans while the other officers tightly bind Swans' feet and arms together. The effect of such restraints was, according to Plaintiff's expert Dr. Werner Spitz, who performed an autopsy and viewed the tape, to cause Swans' death by asphyxiation. (T.T. at 4–28, 4–60.) This finding was consistent with the finding of the Ingham County Medical Examiner, who signed the death certificate, that Swans died of cardiac dysrythmia caused by postural asphyxia with the manner of death as restraint in police custody. (T.T. at 9–16 to 9–17; Exhibit 26.) The autopsies of Drs. Spitz and Sienko also indicated bruising to the wrists and ankles caused by the force of the restraints and a large bruise to the forehead. (T.T. at 4–56 to 4–57.) The tape (consistent with the testimony) shows at 11:49:40 that officers removed Swans' pants by cutting them off with a pocket knife, while keeping him restrained, because he had urinated. (T.T. at 10–84.) The urination, according to Dr. Spitz, indicated that Swans was in the process of dying. (T.T. at 4–49.) After the removal of the pants, Swans is left in his urine while officers cinch the kick-stop restraint so tight that the restraint breaks at 11:51:30 a.m. The officers then bring in other chains and handcuffs to substitute for the kick-stop restraint. Swans is tied with these restraints and the officers leave the cell, without making any careful obser-

vation of Swans' health at 11:53:40 a.m. Swans is motionless as the officers leave the cell and throughout the remainder of the videotape. At 12:04:01 noon, the camera begins to flip between viewing areas (according to the officers because of innocent mistake or malfunction). At 12:04:40 noon, two officers (Diaz and Sherman) re-enter the cell to check Swans. (T.T. at 10–89 to 10–90.) At 12:06:59, these officers and Officers Fabijancic, Szilagyi, and Mezzano move Swans out of cell 6–2 and to cell 6–3. (T.T. at 10–91 to 10–92, 12–125 to 12–128, 15–85.) After Swans is moved, he is remanacled in cell 6–3. (T.T. at 18–73.) Rescue breathing is not started in cell 6–3. The tape shows that Swans is moved from cell 6–3 at 12:09:12 noon and out of the cell block.

Other important events not shown on the videotape include the following: At 12:07 noon or later, Lt. Mezzano called an ambulance. (T.T. at 12–139 to 12–140; 9–155.) After Swans was moved from cell 6–3 to the hall, Officer Sherman began rescue breathing. (T.T. at 18–123.) The paramedic who responded to the call, Steven Barnes, arrived at 12:11 noon. (T.T. at 9–149.) At the time Barnes arrived, Sherman was performing rescue breathing on Swans. (T.T. at 9–161.) Barnes then found Swans to be pulseless, comatose and breathless with fixed and dilated pupils. (T.T. at 9–150.) According to Barnes and Dr. Henry Landsgaard, M.D., the treating physician, the crucial period to begin rescue breathing is four to six minutes from the time of last respiration because without it in four to six minutes the patient will have irreversible brain damage and die. (T.T. at 9–136, 12–98.) Barnes also testified that a delay in treating a patient like Swans (who was found in ventricular fibrillation) of five minutes would, in effect, seal his fate. (T.T. at 9–154.) Edward Swans was taken to the hospital by paramedics and pronounced dead by Dr. Landsgaard at 1:02 p.m. (T.T. at 12–109.) Incidentally, at trial, Plaintiff introduced the City's stipulation that the City "condoned, affirmed and acquiesced in the use of force on [Ed-

ward] Swans." (T.T. at 6–63.) The former Chief of Police Jerome Boles also testified that the actions of the officers were appropriate "based on the policies and practices of the Lansing Police Department." (T.T. at 22–94.)

Additionally, the jury's verdict was informed by the following expert conclusions rendered by Plaintiff's and Defendants' experts: Plaintiff's expert Dr. C. Thomas Gualtieri, M.D., a licensed and board-certified psychiatrist, expressed the opinion that Edward Swans was demonstrating symptoms of schizophrenia and was very, very paranoid when confronted by police. (T.T. at 8–190.) He further concluded that the police, when confronted with an obviously schizophrenic person, should have taken Swans for treatment to an emergency room or to the Veteran's Administration. (T.T. at 8–185.) According to Gualtieri, had they done so, Swans' paranoia could have been relieved with an injection of Thorazine in about 20 minutes. (*Id.*) It was Gualtieri's opinion that the officers' decision to arrest and restrain Swans instead of taking Swans for medication and treatment was mystifying in that the officers chose a course of action which not only was wrong medically for Swans, given his obvious condition, but which also compounded the difficulties of the officers in performing their jobs. (T.T. at 8–193.) According to Gualtieri, Swans' treatment at the hands of police only aggravated his paranoia. (T.T. at 8–195.) Gualtieri expressed the opinion that because of schizophrenia Swans did not understand his situation and was functioning at the mental and emotional level of a three-year-old child. (T.T. at 8–189.) Gualtieri noted that restraints must be applied conservatively when dealing with mentally-ill persons, such as Swans, due to the risk of injury. (T.T. at 8–198.) Gualtieri also shared the view of the coroner that Swans died due to asphyxia caused by the restraint. (T.T. at 8–208.) The opinions of Dr. Gualtieri as to treatment of Swans with Thorazine and similar drugs were echoed by Dr. Harold L. Klawans, M.D., a licensed, board-certified, and world-renowned medical doctor and expert in neurology and pharmacology. (T.T. at 5–52, 5–71). Klawans opined that in light of the medical evidence Swans died by suffocation and not due to cardiac arrest caused by past Thorazine use or the use of any other drug. (T.T. at 5–85 to 5–88.)

Plaintiff's expert Dr. Emanuel Tanay, M.D., a licensed medical doctor, board-certified psychiatrist and recognized-expert in forensic psychiatry, further expressed opinions based on medical evidence, testimony and the videotape. It was Tanay's opinion that police officers, because of their regular contact with the mentally-ill, need to have some knowledge of mental illness. (T.T. at 3–25 to 3–27.) Tanay also expressed the opinion that Swans was a chronic schizophrenic with periods of acute exacerbation which were regularly treated and that on the day in question he had such an episode. (T.T. at 3–42, 3–53.) Tanay further opined that the behavior of officers in restraining Swans was group-oriented torture—conduct which was intended for the infliction of pain. (T.T. at 3–30, 3–55.) According to Tanay, Swans was obviously mentally-ill and should have been directly taken to a hospital for treatment. (T.T. at 3–61.)

Dr. Leonard Territo, Ed. D., a criminologist with practical experience in law enforcement and detention, further testified for the Plaintiff. Dr. Territo testified that it is common and required police procedure to take severely mentally-ill persons to hospital for treatment and that Swans should have been taken for treatment instead of being booked and restrained. (T.T. at 8–37, 8–59.) He further testified that the 10–96 code used by officers refers to an emotionally disturbed individual. (T.T. at 8–45.) He stated his opinions that the "hogtie" restraint of Swans was unnecessary and could have been avoided by simply placing Swans in a cell. (T.T. at 8–68.) He expressed the opinions that placing the weight of several individuals on Swans' back was an improper restraint technique because of risk of suffocation.

(T.T. at 8–72.) Territo also reviewed the manufacturer's warnings relating to the kick-stop restraint which included the following warnings: (1) do not over-tighten because this may cause circulation problems; (2) do not leave the prisoner unattended at any time; (3) do not leave the prisoner restrained for long periods of time. Prolonged restraint could cause serious injury or death. (Exhibit 32; T.T. at 8–80 to 8–82.) These same warnings, according to the Jail Administrator, Lt. Mezzano, were unknown to him at the time that the device was applied to Swans by officers under his supervision. (T.T. at 13–27 to 13–30.) Territo also reviewed the facts of the earlier case of Richard Vine. In that case, Richard Vine was jailed in the Lansing City Jail after he drank methal alcohol and told guards, including Kevin Moore, that he had drank methal alcohol. He then died unobserved in a cell after being left handcuffed, bleeding, by guards. (T.T. at 8–86.) Territo opined that the fact that the Police Department took no corrective action, whether retraining, reassignment or *etc.*, indicated that the Department was on notice of such problems and had failed to train or correct problems relating to the care of persons in its facility. (T.T. at 8–86 to 8–91.) Such opinions were admitted on a limited basis against the City of Lansing and Defendant Moore but not against other Defendants.[1] (T.T. at 8–91, 6–119, 6–123 to 6–124.) Territo also opined that the Department should have trained its officers as to safe use of the kick-stop restraint system and dangers inherent in its use. (T.T. at 8–99.) Territo's conclusions were echoed in the testimony of Plaintiff's expert George Kirkham, Ph. D., another criminologist with practical experience in law enforcement and detention. Kirkham expressed the opinion that the City of Lansing's training and supervision of its officers as to the use of force and the provision of medical care was grossly inadequate. (T.T. at 8–127 to 8–128.)

Plaintiff's case was also helped by an opinion expressed by Dr. James F. Cooper, M.D., the Defendants' expert witness. On cross-examination, Dr. Cooper was asked while viewing the videotape whether it was obvious that Swans, at the time that officers returned to cell 6–2, was in a serious medical condition. Dr. Cooper responded that "I think that would be obvious to anyone." (T.T. at 24–89.) This was significant because it contradicted the officers' claims that they did not know at that point of time that Swans needed medical care and it rendered indefensible the conduct of the officers in moving Swans from the cell and re-manacling him in the next cell before summoning medical care.

Based on this and other similar testimony, the jury returned its verdict of damages based on its findings (contained in the Special Verdict Form) that all of the Defendants, except Viele and Szilagyi, had used force which was excessive at the direction of City policy and due to lack of training, that all of the Defendants, except Defendant Layne, had violated Swans' constitutional rights to medical and psychological care consistent with the lack of City training, that all of the Defendants, except Viele and Szilagyi, had committed a battery against Swans, and that all of the Defendants were grossly negligent.

## II. *Motion for Remittitur*

■ As mentioned, the first of Defendants' several motions is a Motion for Remittitur to reduce the jury award of compensatory and punitive damages as excessive. The standard for a remittitur under Federal Rules of Civil Procedure

---

1. Incidentally, prior to commencement of trial, the Court advised each of the individual defendants and the City of Lansing that it was likely that their interests were adverse and that they should employ separate counsel instead of being jointly represented by James O'Leary. At such time, they declined to obtain separate counsel. During trial, when evidence was offered against the City of Lansing and Defendant Moore but not against the other Defendants, the Court again raised the issue and the parties again declined separate representation. It is evident from the jury's verdict that the Defendants' interests were not well served by the joint representation they elected.

50 and 59 and the law of the Sixth Circuit Court of Appeals is as follows: "[A motion for remittitur] should be granted only 'if the award clearly exceeds the amount which, under the evidence in the case, was the maximum that a jury could reasonably find to be compensatory for the plaintiff's loss.'" *Roush v. KFC Nat'l Management Co.*, 10 F.3d 392, 397 (6th Cir.1993) (quoting *In re Lewis*, 845 F.2d 624, 635 (6th Cir.1988)); *see also Strickland v. Owens Corning*, 142 F.3d 353, 357 (6th Cir.1998) (quoting standard).

■ In this case, the jury awarded 9.8 million dollars jointly and severally against the Defendants for actual damages and 3.125 million dollars against the individual Defendants. There are 10 heirs at law (five adults and five young children) who, by the decedent's death, were deprived of a future relationship and contributions from the decedent. All of the adult relatives expressed extreme sadness, some bordering on depression, upon the loss of Edward Swans. Furthermore, the onus of the award is evidently for the pain and suffering experienced by Edward Swans prior to his death. The testimony, interpreted in a light favoring the non-movant, established that the Defendants declined to provide necessary medical and psychological care which was clearly and urgently needed and that in restraining him they used excessive force which served no legitimate public purpose and was in fact suffocation and torture. This treatment was inflicted over a prolonged period and in the opinions of the experts called would have been gravely terrifying to a rational person let alone someone possessing diminished understanding, such as Edward Swans. The treatment was inflicted by not one but several officers and reflected regular practices in the City of Lansing Jail by these detention officers. The case law cited as "comparable incidents" do not bear a resemblance to the facts of this case and provide no sufficient reason to reduce a rational and well-reasoned verdict of the Defendants' peers. There is simply no mathematical formula for computing Plain-

tiff's pain, suffering, the loss of companionship and society, nor the amount of punitive damages necessary to dissuade the Defendants from similar conduct in the future. *See Kirk v. Ford Motor Co.*, 147 Mich.App. 337, 346–47, 383 N.W.2d 193 (1985). The jury's award was not excessive in the least.

### III. Motion for Judgment as a Matter of Law.

Defendants also request that the Court set aside the jury verdict under Rules 50 and 59 as a matter of law because the verdict cannot be supported by the evidence submitted at trial. Defendants make this claim in three regards: first, that there was insufficient evidence that the City of Lansing adopted any policy for its officers approving of the unconstitutional conduct alleged here; second, that there was insufficient evidence for the jury to return a verdict against Donald Viele as to failure to provide medical care and gross negligence; and third, that there was insufficient evidence to permit an award against any of the Defendants as to excessive force or battery.

■ Under the Rules of Civil Procedure and the law of the Sixth Circuit Court of Appeals,

One who challenges the weight of the evidence argues that the jury's verdict, although supported by some evidence, is still clearly against the weight of the evidence. Unlike motions for directed verdicts and judgments notwithstanding the verdict, in ruling upon a motion for a new trial based on the ground that the verdict is against the weight of the evidence, the trial court must compare the opposing proofs, weigh the evidence, and set aside the verdict if it is of the opinion that the verdict is against the clear weight of the evidence. *TCP Indus., Inc. v. Uniroyal, Inc.*, 661 F.2d 542, 546 (6th Cir.1981). It should deny the motion if the verdict is one which could reasonably have been reached, and the verdict should not be considered unrea-

sonable simply because different inferences and conclusions could have been drawn or because other results are more reasonable. *Id.*

*J.C. Wyckoff & Associates, Inc. v. Standard Fire Ins. Co.,* 936 F.2d 1474, 1487 (6th Cir.1991); *see also Strickland,* 142 F.3d at 357. The motion must be considered in a light most favorable to the non-movant. *Williams v. Nashville Network,* 132 F.3d 1123, 1130 (6th Cir.1997).

■■■ Defendant City of Lansing's contention that the evidence against it was insufficient as a matter of law stems from the United States Supreme Court's holding in *Monell v. Dept. of Social Services,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), which determined that a local government may not be sued solely because of an injury inflicted by an employee but may be sued when the employee's acts represent the execution of a government policy or custom and is the moving force for the constitutional violation. As the Sixth Circuit has said in repeating that standard, "to satisfy the *Monell* requirements a plaintiff must 'identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy.'" *Garner v. Memphis Police Dept.,* 8 F.3d 358, 364 (6th Cir. 1993) (quoting *Coogan v. City of Wixom,* 820 F.2d 170, 176 (6th Cir.1987)); *see also Searcy v. City of Dayton,* 38 F.3d 282, 287 (6th Cir.1994). Although these standards are difficult to meet in the average case, courts have held that they are met by evidence that the policy makers fostered and approved of the challenged conduct, *see Grandstaff v. City of Borger,* 767 F.2d 161, 171 (5th Cir.1985), or where there is a failure to adequately train officers resulting from deliberate indifference which causes the injury in question, *see Matthews v. Jones,* 35 F.3d 1046 (6th Cir. 1994). In this case, there is sufficient evidence to support a verdict against the City of Lansing on both theories. The restraint of Swans with the kick-stop restraint device was conduct *uniformly* performed by six separate officers under the watch of the Jail Administrator and afterwards was condoned by the Police Chief and the City's attorney as consistent with city policy. The conduct which was affirmed as done pursuant to city policy was clearly shown on videotape so that the jury understood that city policy favored the use of excessive force in violation of the Fourth Amendment. The use of the restraint device on Swans was consistent with the unstated city policy of using maximum restraints on non-compliant prisoners in at least a "hundred" prior cases. Although the restraint device was commonly used by the officers in the Jail, the officers were not trained concerning the manufacturer's warnings about the use of the device as reflected in their treatment of Swans and in other testimony and despite that the manufacturer's warnings suggested that death might result from improper use of the device. Under these circumstances, there is sufficient evidence to support the jury's findings that the City had adopted policies favoring the use of excessive force by its officers and that the City by its failure to train and deliberate indifference had caused both excessive force and a failure to provide needed emergency medical and psychological care to Edward Swans.[2]

■■ Defendant Viele's contention that the evidence against him was insufficient to support liability for denial of medical care is also incorrect. The evidence submitted at trial showed that Defendant Viele violated Swans' constitutional rights on two instances: first, when he delivered Swans for booking at the Jail instead of taking him for immediate medical care, which was obvious from his condition was necessary on an immediate basis; and second, while he was present in the cell 6 block within sight of Swans after Swans

---

2. Furthermore, the jury's findings against the City are harmless in light of discussions with the parties' attorneys outside of the presence of the jury, which revealed that the City is contractually bound to indemnify the officers.

was in distress due to the restraints caused by the detention officers and then failed to summon emergency care. As such, the evidence supports a finding that Defendant Viele violated Edward Swans' clearly established right to emergency medical and psychological care (and that Defendant Viele was grossly negligent). *See City of Revere v. Massachusetts Gen. Hospital,* 463 U.S. 239, 243–44, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983); *Roberts v. City of Troy,* 773 F.2d 720, 723 (6th Cir. 1985).

 Finally, Defendants claim that each of the detention officers are entitled to judgment as a matter of law because one could interpret the force used by them as reasonable on the facts of record. This statement, by itself, ignores the legal standard applicable to Rule 50 motions. The question is whether the evidence of record supports the jury's verdict and not whether a different conclusion might have been reached. *Black v. Zaring Homes, Inc.,* 104 F.3d 822, 825 (6th Cir.1997). It is certain that an arrestee has a clearly established right against the use of excessive force. *Graham v. Connor,* 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); *Martin v. Heideman,* 106 F.3d 1308 (6th Cir.1997). Since the record supports inferences by the jury that the detention officers used force against Swans at times when he was not resisting because he was unconscious and because he was ill and when they could have simply refrained from the use of any force, the record supports the jury's findings as to excessive force and battery.

### IV. Motion for New Trial

 Defendants have requested a new trial pursuant to Rule 59 because of supposed errors in the jury instructions, the verdict form, judicial bias, prejudice caused by trial counsel, errors in the introduction of evidence, and other legal error. A new trial is warranted under the Rule when a jury reached a "seriously erroneous result" as evidenced by: (1) the verdict being against the weight of the evidence; (2) the damages being excessive; or (3) the

trial being unfair to the moving party in some fashion, such as prejudice or bias or instructional error. *Holmes v. City of Massillon,* 78 F.3d 1041, 1046 (6th Cir. 1996).

### A. Instructions and Special Verdict Form

 Defendants claim that the instructions and verdict form given were prejudicially misleading and failed to properly inform the jury of the law. Under the law, courts must be reluctant to reverse a jury verdict and must review jury instructions "'as a whole in order to determine whether they adequately inform the jury of the relevant considerations and provide a basis in law for aiding the jury in reaching its decision.'" *O–So Detroit, Inc. v. Home Ins. Co.,* 973 F.2d 498, 502 (6th Cir.1992) (quoting *Cipriano v. Mercantile Ins. Co. of America,* 284 Mich. 346, 279 N.W. 855, 857 (1938)). A judgment may be set aside only if the instructions viewed as a whole, were confusing, misleading and prejudicial. *Beard v. Norwegian Caribbean Lines,* 900 F.2d 71, 72–73 (6th Cir. 1990). Furthermore, a failure to timely object to jury instructions waives all but "plain error" pursuant to Rule 51. *Chonich v. Wayne County Community College,* 973 F.2d 1271, 1275 (6th Cir.1992); *Libbey–Owens–Ford Co. v. Insurance Co. of North America,* 9 F.3d 422, 427 (6th Cir.1993). Similarly, as to the alleged errors in the Special Verdict Form, new trial is warranted only if the questions "'mislead or confuse the jury, or if they inaccurately frame the issues to be resolved by the jury.'" *Shah v. Pan American World Services, Inc.,* 148 F.3d 84, 96 (2nd Cir. 1998) (quoting *Vichare v. AMBAC Inc.,* 106 F.3d 457, 465 (2nd Cir.1996)). In so determining, though, the special verdict questions "'must be read in conjunction with the judge's charge to the jury.'" *Id. (quoting Vichare,* 106 F.3d at 466).

In this case, only one formal objection was made to the instructions by Defendants. Counsel requested a more exten-

sive definition of "deliberate indifference" at Instruction 25. (T.T. at 193.) Counsel also made two formal objections to the verdict form—that the verdict form did not contain specific findings as to probable cause and municipal liability. These latter two objections were addressed at the time by clarifying comments to the jury and on the verdict form. (T.T. at 25–194, 25–203.) As such, the great majority of these instructions are reviewed now only for plain error.

■ Defendants first complain about Jury Instruction No. 27, that the Court in giving the *Monell* standards failed to define the terms "policy" or "custom" for the jury. The instruction as issue was a standard instruction for municipal liability under 42 U.S.C. § 1983 taken from 3 E. Devitt, C. Blackmar, and M. Wolff, *Federal Jury Practice and Instructions,* § 103.11 (West.Pub.Co.1997 Supp.). The technical meaning of those words was sufficiently conveyed by the instruction such that the failure to include any additional definition was not error, let alone plain error.

Defendants complain that Instruction No. 28, which instructs the jury as to municipal liability premised on failure to train by the City, was errant and confusing. The instruction at issue was taken, almost verbatim, from the language of the Sixth Circuit Court of Appeals in the case of *Matthews v. Jones,* 35 F.3d 1046, 1049 (6th Cir.1994), a decision giving the standard for municipal liability for failure to train. The instruction is neither at error nor plainly erroneous.

Defendants complain about the failure to adequately define deliberate indifference in Instruction No. 25 and the inclusion of Instruction No. 26. Instruction No. 25 was taken in part from the Eighth Circuit Court of Appeals Manual of Model Jury Instructions, § 4.31. The instruction was modified, as suggested in the Eighth Circuit's comments, to include an explanation of "deliberate indifference." The explanation of deliberate indifference is taken almost verbatim from the United States Su-

preme Court's definition of that term in *Farmer v. Brennan,* 511 U.S. 825, 841, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994), and adequately informed the jury of the legal standard. As for Instruction No. 26, this instruction was added after the Court's preliminary draft of instructions when the Court was informed after conference with counsel and the Court's clerk that Instruction No. 26 was requested by all parties who deemed the instruction essential given the holding of the Sixth Circuit Court of Appeals in *Holt v. Artis,* 843 F.2d 242, 246 (6th Cir.1988). The Court allowed the instruction in light of the parties' agreement and because the instruction only makes clear that a specific intent is not required as an element of the Plaintiff's case with the exception of the deliberate indifference standard explained in the other instructions. The giving of the instruction was not error in light of the law, let alone plain error. However, Defendants' objection now to an instruction they insisted on at the time of trial is blatantly inconsistent.

Defendants now object to the Special Verdict Form in that it failed to include a specific finding as to municipal liability. This issue was discussed just prior to the jury's deliberation and the Court resolved to make the verdict form clear beyond any peradventure by referencing next to the lines for the jury's findings as to the City's liability or non-liability the applicable standards for municipal liability contained in Instructions Nos. 27 and 28. The Court having done so, the verdict form was perfectly clear. The objection is denied as meritless.

■ Defendants contend that the verdict form was errant in failing to include specific questions as to proximate cause and deliberate indifference. This objection is likewise meritless. The instructions informed the jury of the requisite elements of liability as to each of the claims. The fact that the jury had to combine some of its findings (as is typical of verdicts) was hardly error, let alone plain error.

 Finally, Defendants contend that the Court should have segmented its verdict form to include questions about the use of force by the Defendants at different time periods. This objection was waived and should be denied because the failure was neither error nor plain error. The case law referenced by Defendants, *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir.1996), does not require "segmentation" as to jury verdicts. The Defendants used force against Edward Swans continually from the time of booking until they left cell 6–2, such the segmented verdict approach advocated by the Defendants makes little sense here and would have been practically unworkable, particularly since there was so much disagreement as to what occurred prior to videotaping.

### B. Judicial Bias or Favoritism

 Defendants argue that comments made by the Court prejudiced the jury's consideration and warrant a new trial. It is well recognized that judges should strive toward an atmosphere of impartiality in court proceedings especially in those cases heard by jury. *Rocha v. Great American Ins. Co.*, 850 F.2d 1095, 1101 (6th Cir.1988). With this said, however, the courts also recognize in both criminal and civil cases that a jury's verdict should be set aside "only if the record discloses the judge was actually biased or the judge's remarks projected the appearance of advocacy or partiality." *Mitchell v. Kirk*, 20 F.3d 936, 937 (8th Cir.1994). The Court must determine whether the alleged bias "was so prejudicial that it denied [the litigant] a fair, as opposed to a perfect trial." *United States v. Edmond*, 52 F.3d 1080, 1099 (D.C.Cir.1995); *see also Shah v. Pan American World Services, Inc.*, 148 F.3d at 98 (stating that the standard is whether a "fair trial," as opposed to a "perfect trial," was denied). Generally, a finding of judicial bias warranting a new trial must be based on "an abiding impression left from a reading of the entire record" rather than on the basis of a "a few improper comments." *United States v. Twomey*, 806 F.2d 1136, 1140 (1st Cir.

1986). When a party failed to object to allegedly inappropriate or prejudicial remarks or conduct by the court, the alleged acts of bias will be reviewed only for plain error. *Mitchell*, 20 F.3d at 937. Furthermore, pursuant to Rule 61, a jury's verdict should be disturbed because of improper judicial comments only if the error was so prejudicial as to deny substantial justice to a party. *Rocha*, 850 F.2d at 1098.

 In this case, making a judgment as to judicial comments and bias involves a time-consuming analysis because of the great length of the record. This record reflects frustration on the part of the Court in that counsel for both Plaintiff and Defendants continually failed to heed judicial rulings on objections and failed to heed the Court's requests that they try the matter expeditiously. (T.T. at 16–155 to 156.) As a result, remarks were made to both counsel to expedite examinations. For instance, on March 18, 1998, the Court lectured both attorneys to avoid improper comments before the jury, to avoid redundant questions, to avoid contentiousness, and to ‘expedite trial in the interest of "aid[ing] us in searching for and getting to the truth." (T.T. at 7–105.) The Court's reading of the entire transcript reveals that while negative comments were made regarding both counsel in the presence of the jury that these comments were made even-handedly and do not reflect bias or suggest a result to the jury. Similarly, the Court on many instances made comments to witnesses and asked questions of witnesses to clarify testify. Overall, the comments and questions asked reflect a concern for all parties and all witnesses and a desire that the evidence presented be explained sufficiently to inform the jury's understanding. During trial, the Court's comments and questions were repeatedly prefaced with warnings to the jury that it was the final judge of the facts and the credibility of witnesses and that the comments of counsel and the Court were to be disregarded. (T.T. at 16–156; Jury Instruction No. 1.)

As to the particular objections raised by Defendants, Defendants first argue that friendly questions to some of Plaintiffs' expert witnesses (Drs. Klawans, Kirkham, and Gualtieri) about books and restaurants suggest judicial bias. The questions and comments referenced were made at the beginning or close of testimony and were unrelated to the subjects of testimony. The questions and comments referenced do not reflect bias or suggest a result to the jury. Rather, they are mere cordiality, like the offering of water to Dr. Cooper, the Defendant's expert, or the excusing of Patricia Layne from proceedings due to illness. (T.T. at 19–9, 19–28, 19–41.) As such, these comments and questions provide no basis for setting aside the jury's verdict.

Defendants also criticize the Court's substantive questions of the various witnesses. Dr. Kirkham was asked by the Court about an alternative restraint position. The Court inquired of Kirkham only to clarify what he meant in his testimony and the question of Kirkham suggested nothing else. Officer Thornburg was asked about the Department policy requiring treatment of a "person requiring treatment" for the purpose of understanding his interpretation of the policy. Chief Boles was asked about a brochure which re-stated matters discussed in his and other witnesses' testimony and exhibits relating to safe restraint techniques. He was asked these questions to clarify the positions he had taken in his testimony. Overall, the questions asked were fair considering the nature of the trial and did not prejudice substantial rights of the Defendants. Likewise, the Court's comment to James O'Leary to the effect that lawyers should not ask "why not" of witnesses was only intended to speed the otherwise delayed presentations of evidence. It did not reflect any bias on the part of the Court nor demonstrate impartiality to the jury any more so than did the Court's comments to Geoffrey Fieger that some of the testimony he offered was redundant and that he improperly raised his voice on occasion. (T.T. at 7–106, 7–180, 16–154 to

16–155.) Defendants also complain that in two instances the Court used the wrong words to describe events: the word "strangulation" instead of "suffocation" when inquiring of Dr. Territo and in asking during the jail visit about the screen in the booking area. Neither of these instances are significant in the contexts in which they occurred. The word "strangulation" is a rough synonym for "suffocation" and did not confuse the jury since they had the videotape depicting the use of force at issue. Likewise, the question as to the place where Swans was "pushed out against the detention screen" was a question only as to place and implicitly recognized that there was disputed testimony as to the excessiveness of the force used.

This Court has read the entire record of proceedings including the allegedly prejudicial comments and testimony. The parties, doubtless, did not receive a perfect trial just as any court presided over by human judge that tries matters of such duration, complexity, contention and deep personal feelings between the litigants will not render a perfect trial. Regardless, the parties, both Plaintiff and Defendants, have had a fair hearing before the jury and the jury's findings should not be disturbed.

### C. Misconduct by Plaintiff's Counsel

 Defendants also assert a right to a new trial because of allegedly prejudicial remarks of Plaintiff's counsel, Geoffrey Fieger. As noted by the Sixth Circuit Court of Appeals, "[t]he determination of the extent of permissible comment and argument by defense counsel resides primarily in the sound discretion of the trial judge." *Sutkiewicz v. Monroe County Sheriff,* 110 F.3d 352, 361 (6th Cir.1997) (quoting *Ranger, Inc. v. Equitable Life Assur. Society,* 196 F.2d 968, 975 (6th Cir. 1952)). A party seeking a new trial must make a concrete showing that the misconduct of counsel consistently permeated the entire trial from beginning to end. *Sutkiewicz,* 110 F.3d at 361; *City of Cleveland v. Peter Kiewit Sons' Co.,* 624 F.2d 749

(6th Cir.1980). In making this determination, the court must examine whether there is a reasonable probability that the verdict of a jury has been influenced by improper conduct and this depends upon the totality of the circumstances, including the nature of the comments, their frequency, their possible relevancy to controverted issues, the manner in which the parties and the court treated the comments, the strength of the case and the verdict itself. *Kiewit*, 624 F.2d at 749. As the Sixth Circuit Court of Appeals has noted in reviewing lengthy trials, the results of such a trial should not be reversed because of a "few words in a long closing argument." *In re Air Crash Disaster*, 86 F.3d 498, 525 (6th Cir.1996).

■■■ Defendants first claim prejudice based on attorney Fieger's dismissal of the complaint against former Defendant David Dickson (an African–American officer) and a remark made by Fieger during closing which asked the jury to consider whether Edward Swans' treatment would have been the same had he been white. As to the dismissal, the dismissal of Dickson occurred at the beginning of the trial when the complaints against several other officers, some of whom were presumably white, were also dismissed. (T.T. at 1–184.) The presumptive reason for the dismissal under Federal Rule of Civil Procedure 41 was that the claims against those several officers were not as strong as the claims against the remaining Defendants and would diminish the Plaintiff's case against the remaining Defendants (most of whom were the detention officers directly involved in the restraint). Such a dismissal was unquestionably proper and no objection was made at the time of dismissal. The remarks relating to race were also proper in the context of trial. First of all, there was testimony heard without objection from Plaintiff's expert witness Dr. Tanay that the identity of the victim as black and mentally-ill played a part in the group dynamic which victimized him. (T.T at 3–90.) In light of such testimony, the comment was properly made. Furthermore, most of the comments referencing race and mental illness were for the purpose of discouraging jury discrimination based on these factors and as such were proper in the utmost.

■■■ Defendants object to attorney Fieger's references in his opening and closing statements to a "conspiracy." The Defendants' objections in this regard are unpersuasive. The Court sustained the Defendants' objection to the word "conspiracy" during opening statements. The Court nevertheless, during trial and closing, allowed testimony relating to the autopsy by Dr. Sienko that Defendants attempted to persuade Dr. Sienko to reach a finding of heart attack caused by manic exhaustion based on the opinions of a Mr. Bruce Siddell (a media consultant who proposed to employ Dr. James Cooper to announce this opinion). (T.T. at 9–20 to 9–22.) This testimony was damaging to Defendants in that it suggested that Dr. Cooper, the Defendants' expert, uniformly testified in custody death cases regardless of the pertinent facts. (T.T. at 24–72.) The allowance of such testimony and argument was appropriate in light of the facts of record.

■■■ Defendants further object to the portion of attorney Fieger's closing argument which, referring to a statement by Defendant Diaz that he was just following orders, argues that such a defense was tried at Nuremberg and failed. (T.T. at 25–51, 25–175.) There was no objection by defense counsel to the argument during the closing. The making of the argument was not plainly improper and did not prejudice the jury considering that it was specifically directed at refuting an improper defense suggested by Defendant Diaz— that subordinate officers should not be found liable merely because they are subordinates.

■■■ Defendants also object now to other statements made by attorney Fieger during his closing including Fieger's references to the fact that the decedent was allowed to lie in urine, references to "in-

human" treatment, references to God, references to lies, and references to having the jurors' heads examined if they believe Defendants. It is significant with respect to all of these references that attorney Fieger noted before making his argument that he was taught, on the advice of a reader of George Bernard Shaw, to speak disagreeably so that people will listen. This remark, by itself, indicated to the jury that attorney Fieger tends to speak disagreeably to get their attention and, accordingly, dispelled possible prejudice. Interpreted in such a light, the referenced comments were fair argument. First of all, attorney Fieger did not tell the jury that they needed their heads examined. This is defense attorney O'Leary's characterization of the argument. (T.T. at 25–122.) Attorney Fieger did say that certain defense arguments and testimony were "lies" and did say that "[i]f you believe that, then I have a bridge to sell you in Brooklyn...." (T.T. at 25–89.) Attorney Fieger's characterizations of the testimony were proper inasmuch as they called attention to conflicts in testimony and the conflicts between the Defendants' testimony and the videotape evidence. These conflicts were such that the Defendants' testimony was fairly described as deliberately false and unbelievable. Furthermore, in light of the evidence discussed, the Defendants' conduct toward Edward Swans could be properly described as "inhumane"—which is presumably what attorney Fieger meant in referring to "inhuman" conduct. Likewise, the fact that Swans was made to lie in his own urine is simply a fact of record evident from the videotape and not unduly prejudicial. References to "God" in attorney Fieger's closing statement were, in the main, either mere figures of speech, references to the words of the Declaration of Independence or references to how Swans was "talking to God" in the presence of the Defendants on the day in question. (T.T. at 25–48, 25–60.) Such references were appropriate in light of the facts of record. Finally, the Court notes that both this trial and jury deliberations were lengthy, that de-

fense counsel had a full and fair opportunity to respond to these comments, that the jury did not seem unduly affected by them, that the Plaintiff's case was extremely strong, and that the verdict was fair in light of what Plaintiff properly described as the torture/suffocation death of Edward Swans. As such, the Court determines that the comments were proper, that they did not permeate the trial, and that the challenged comments did not otherwise affect the otherwise valid jury verdict.

## D. Evidentiary Objections

 Defendants have also requested a new trial based on certain evidentiary rulings made by the Court during trial. Under Federal Rule of Evidence 103, evidence which is improperly allowed over objection warrants relief only if it affects a substantial right of a party. The inquiry of whether evidence is harmless or affects a substantial right involves an assessment of the likelihood that error affected the outcome of the case. *Schrand v. Federal Pacific Elec. Co.*, 851 F.2d 152, 157 (6th Cir.1988). This inquiry includes a consideration of whether the evidence was central or peripheral to the issues to be determined by the jury and the strength or absence of other relevant evidence. *Id.* Evidence which is improperly allowed and not objected to warrants relief only if the error was plain. Fed.R.Evid. 103(d).

 Defendants' first evidentiary objection is that the Court erred under Federal Rule of Evidence 407 in admitting evidence that the City of Lansing subsequently changed its policies relating to use of restraints on mentally-ill persons. The Court admitted this evidence under an exception to Rule 407 because the City, through its expert Darryl Ross and its officers, had claimed that its formal restraint policy was necessary and that other alternatives were not feasible. (*See, e.g.,* T.T. at 23–91.) In light of such claims, the evidence was properly admitted under Rule 407 to show feasibility and for the

purpose of impeaching those witnesses. *In re Air Crash Disaster*, 86 F.3d 498, 531 (6th Cir.1996). Furthermore, this evidence was not central at all to the proofs and did not affect the Defendants' substantial rights in the context of the strong proofs introduced against the Defendants in this trial.

▇▇▇ Defendants claim that the Court erred in admitting the expert testimony of Dr. Tanay. The testimony of Dr. Tanay was admitted with limitations designed to insure that Tanay did not testify improperly about the ultimate issues of fact to be determined by jury. Dr. Tanay, as a renowned forensic psychiatrist, had expert medical and forensic opinions which assisted the jury in understanding the nature, extent and obviousness of Edward Swans' mental illness, the necessity, appropriateness, and safe means of restraining schizophrenics suffering acute symptoms, and individual and group psychological dynamics which sometimes cause excessive force, abuse of power and torture. Each of these opinions was expressed in a manner designed to leave the ultimate issues of fact for determination by the jury. *See United States v. Sheffey*, 57 F.3d 1419, 1426 (6th Cir.1995); *Heflin v. Stewart County*, 958 F.2d 709 (6th Cir.1992); *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir.1994). Defendants object to the use of the word "torture" in the testimony of Dr. Tanay. This word was not used idly or for an improper purpose to inflame the jury. Rather, the testimony of Dr. Tanay, an expert who has investigated incidents of international torture and human rights abuses, properly informed the jury about psychological dynamics which cause some individuals and groups to inflict pain for the purpose of inflicting pain. As such, the testimony was properly allowed under Federal Rules of Evidence 702 to 704 and did not adversely affect substantial rights of the Defendants.

Defendants further object to questions of Dr. Sienko which suggested that there was a "conspiracy" to falsely attribute the cause of death. As explained above, the questions of Dr. Sienko were proper under Federal Rules of Evidence 401 and 403 in that they aiding the jury's understanding of the proximate cause of death of Edward Swans. Also, the Court appropriately limited the use of the word "conspiracy" during the testimony to avoid any confusion or prejudice to the jury. As such, the testimony was properly allowed. Moreover, this testimony itself was so brief and fleeting that it did not substantially affect the Defendants' rights in the context of the other proofs at trial.

▇▇▇ Defendants assert that the Court erred at trial in failing to permit the introduction of the Neuman study—Tom Neuman et al., "Restraint Position and Positional Asphyxia," 30 *Annals of Emergency Med.* 578 (1997). The Neuman study purported to establish that in young, healthy individuals who were voluntarily restrained without additional pressure on their abdomen the restraint did not affect blood oxygenation levels. However, such study had no application to Edward Swans' death because he was not young, healthy, or voluntarily restrained. Edward Swans had a large abdomen. He was restrained against his will and in a violent fashion in which several officers applied pressure to his back. As such, the study would have only been misleading to the jury on the issue of proximate cause. The study would also have been misleading on the issue of gross negligence because the study, published in 1997, did not give the officers in 1996 a reason to believe that their conduct was safe. Accordingly, the evidence was properly excluded under Rules 401 and 403. In addition, the exclusion of the testimony did not harm Defendants because Dr. Klawans, during Plaintiff's testimony, described the findings of the Neuman study and explained why they were not applicable.

▇▇▇ Defendants also challenge the admission of evidence relating to the Vine incident. The evidence challenged, discussed earlier, was admitted only after considering the policies under Federal

Rule of Evidence 404(b) and determining that the evidence was admissible against only Defendant Moore and Defendant City of Lansing as evidence that the excessive force/failure to provide medical care to Swans occurred intentionally and not as a result of a mistake. The evidence was also relevant against Defendant Moore in order to assess the appropriate amount of punitive damages against him to prevent a similar occurrence in the future, considering that the past judgment against Moore had been ineffective in preventing misconduct as to Swans. Thus, the evidence admitted was properly admitted under Rules 401, 403 and 404 and consistent with the requirements of law. *See United States v. Comer*, 93 F.3d 1271 (6th Cir. 1996). The effect of the evidence could have been minimized by the other Defendants had they elected separate representation. Accordingly, the Court determines that the evidence was properly admitted and did not prejudice the Defendants' substantial rights to a fair trial.

### E. *Wrongful Death*

■ Defendants' final basis for challenging the verdict against it and requesting a new trial is its argument that Title 42 United States Code Section 1983 does not permit the bringing of a wrongful death claim by the estate of a decedent against the state actors responsible for the death. This argument has been rejected by every circuit court of appeals having heard it including the Sixth Circuit Court of Appeals. *See Hall v. Wooten*, 506 F.2d 564 (6th Cir.1974); *Rhyne v. Henderson County*, 973 F.2d 386 (5th Cir.1992); *Brazier v. Cherry*, 293 F.2d 401 (5th Cir.1961); *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir.1991); *Bell v. City of Milwaukee*, 746 F.2d 1205 (7th Cir.1984) and cases cited therein. The rule of law advocated by the Defendants has no support either in the law or logic. *See Brazier*, 293 F.2d at 404. Section 1983 was passed by Congress for the express purpose, among others, of preventing murder by state officers. *See Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961). To relieve the Defendants of liability because their acts have gone past mere injury and subjected the victim to death is simply perverse. Such a rule would provide Defendants with an economic incentive to finish their victims. The City of Lansing and the other Defendants need no such incentive and the Court declines to adopt the rule of law advocated by them.

### V. *Motion for Costs and Attorney Fees*

This brings the Court to the final matter of the Plaintiff's Motion for Costs and Attorney Fees. This Motion is made pursuant to Federal Rule of Civil Procedure 54 and Title 42 United States Code Section 1988.

Section 1988 of Title 42 of the United States Code is the fee-shifting statute applicable to actions brought pursuant to Section 1983 of Title 42 of the United States Code. The statute permits a prevailing party a reasonable attorney fee and expert fees as to actions brought pursuant to Section 1981 or Section 1981a. In this matter, given the verdict favoring the Plaintiff, the Court determines that the Plaintiff is entitled to a reasonable attorney fee as a prevailing party.

■ Congress departed from the American rule that parties pay their own attorney fees in enacting Section 1988 in order to encourage quality representation in civil rights cases. *Venegas v. Mitchell*, 495 U.S. 82, 89–90, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990). Under the statute, therefore, a prevailing plaintiff may apply for an attorney fee award in recognition of the need to pay one's attorney. However, the statutory payments are a separate matter from the client's personal duty to pay the attorney, the latter being a matter of contract law governed by state law while the former is controlled by federal court's interpretations of Section 1988. *See id.; Blanchard v. Bergeron*, 489 U.S. 87, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989). For this reason, the Court declines to

award Plaintiff a "contingent" or one-third attorney fee as requested.

■ Under Section 1988, the Court must calculate fees using the lodestar method described by the United States Supreme Court in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). Therein, the Supreme Court said:

> The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate. This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services. The party seeking an award of fees should submit evidence supporting the hours worked and rates claimed. Where the documentation of hours is inadequate, the district court may reduce the award accordingly.
>
> The district court also should exclude from this initial fee calculation hours that were not "reasonably expended." S.Rep. No. 94–1011, p. 6 (1976). Cases may be overstaffed, and the skill and experience of lawyers vary widely. Counsel for the prevailing party should make a good faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority." *Copeland v. Marshall,* 205 U.S.App.D.C. 390, 401, 641 F.2d 880, 891 (1980) (*en banc*) (emphasis in original).

*Hensley,* 461 U.S. at 433–34, 103 S.Ct. 1933. Therefore, the Court approaches this task, keeping in mind, that while the Plaintiff is entitled to a reasonable fee that such fee should not be inflated at public

expensive either by excessive rates or excessive hours.

■ Plaintiff has requested fees for its attorneys at rates as much as $1000 per hour. The $1000 per hour figure is mentioned in connection with the representation by attorney Geoffrey Fieger. Plaintiff's other attorneys have requested fees at rates of $250 per hour or less. Defendants challenge these rates in particular because attorneys, even those specializing in civil rights work, representing clients in the areas of Kalamazoo, Michigan and Western Michigan typically work at market rates less than those requested. As evidence of this, Defendants have filed the affidavit of attorney James Brady and the Michigan Bar Journal's 1997 survey of law firm billing rates and billing practices.

■■ According to the law of this circuit, this Court is required to adjust attorney fee rates to the local market rates for attorneys. *Hadix v. Johnson,* 65 F.3d 532, 536 (6th Cir.1995). For this reason, " 'a renowned lawyer who customarily receives $250 an hour in a field in which competent and experienced lawyers in the region normally receive $85 an hour should be compensated at the lower rate.' " *Hudson v. Reno,* 130 F.3d 1193, 1208 (6th Cir.1997) (quoting *Coulter v. Tennessee,* 805 F.2d 146, 149 (6th Cir.1986)). In light of such law, the Court determines that the requested billing rates of Plaintiff's attorneys must be adjusted downward to reflect the local market rates of attorneys of comparable experience and skills. Therefore, the Court determines that local market rates for Plaintiff's attorneys are as follows: Geoffrey Fieger $225/hour; Mark Bendure $166/hour; Richard Foster $125/hour; Vernon Johnson $125/hour; David Cooper $125/hour; Kevin Kavanagh $125/hour; Victor Valenti $125/hour; Keitha Cowen $125/hour; Jennifer D'Amico $118/hour; and Richard Foster's Paralegal $50/hour.[3]

---

**3.** Hours of a paralegal are properly billed as attorney fees according to the United States Supreme Court. *Missouri v. Jenkins,* 491 U.S. 274, 285, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989).

As for the number of hours reasonably expended, the Court witnessed in this matter a long and arduous trial which was the product of painstaking preparation as well as a long discovery process. In light of the Court's experience with this case, it bears mention that the total number of hours represented is justified by the work done and the results accomplished. However, the Defendants have raised some particular irregularities in the supporting documentation which requires reductions in the hours affirmed in the affidavits as part of the Court exercising "billing judgment" as to the hours billed. In particular, the Court must reduce the number of trial hours billed by attorneys Fieger, D'Amico and Foster to reflect the actual number of hours that court was in session and to eliminate hours billed on days that court was not in session. The Court has done so based on its own Reporter's log of the court sessions and the appearances. The Court has also eliminated from the hours those billed for media conferences, hours spent as to Frederick Postill (which witness was not allowed), and trial and preparation times which appears redundant (*i.e.*, when a general description for time and a specific description were billed on the same day for the same number of hours). The Court has also eliminated from the billings hours and time which appear to be mistakenly billed either in terms of the figures recited or the descriptions recited (such as for jury selection time after the jury was selected and *etc.*). The Court has also excluded time billed by Richard Foster for attendance of the Plaintiff's mock trial as unnecessary since two of Plaintiff's other attorneys conducted the mock trial. The Court has allowed over objection hours of Richard Foster incurred during trial (in a reduced number) because in the Court's judgment the Plaintiff required multiple attorneys at trial including one, such as Richard Foster, with a special knowledge of the Estate of Edward Swans. Based on the Court's determinations, the following hours have been reasonably expended on behalf of the Plaintiff: Geoffrey Fieger 653.95 hours; Mark Bendure 26.60 hours; Richard Foster 683.05 hours; Vernon Johnson 20 hours; David Cooper 6.9 hours; Kevin Kavanagh 17.6 hours; Victor Valenti 35.7 hours; Keitha Cowen 4 hours; Jennifer D'Amico 730.45; and Richard Foster's Paralegal 206 hours. The Court views these hours as reasonably and necessarily expended in this litigation and declines any further request to reduce them.

Based on the total hours and rates, the Court computes a lodestar fee as follows: Geoffrey Fieger $147,138.75.; Mark Bendure $4,415.60; Richard Foster $85,381.25; Vernon Johnson $2,500.00; David Cooper $862.50; Kevin Kavanagh $2,200.00; Victor Valenti $4,462.50; Keitha Cowen $500.00; Jennifer D'Amico $86,193.10; and Richard Foster's Paralegal $10,300.00. This adds to a total lodestar fee of $343,953.70. The Court, considering the various factors suggested by the Supreme Court in *Hensley* for modifying the lodestar fee, nevertheless considers this amount as a just attorney fee award in this case.

Plaintiff's Motion also requests the full amount of expert witness fees incurred in this matter pursuant to Section 1988. This aspect of the Motion is not well-received in light of United States Supreme Court precedent. In *West Virginia University Hospitals, Inc. v.* Casey, 499 U.S. 83, 102, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991), the Supreme Court held that reimbursement for expert witness fees and other expenses is not available pursuant to Section 1988. Although much more nominal fees are available to a prevailing plaintiff for witness fees and the like pursuant to 28 U.S.C. § 1920 and 28 U.S.C. § 1821(b), it is not the Court's usual practice to award such fees by motion. Rather, under Local Civil Rule 54.1, costs and witness fees under these statutes may be obtained by the filing of a bill of costs with the Court's Clerk. The Plaintiff, not having complied with this procedure, the request for costs is denied.

Accordingly, the Motion for Costs and Attorney Fees is granted in part and denied in part. The Court approves an attorney fee of $343,953.70 in favor of the Plaintiff and against all Defendants, jointly and severally, and disapproves of any award of costs. The Court's Judgment shall be modified as of the date of this Opinion to include such award, which shall bear interest from this date forward as specified by law.

## COUNSEL FOR DEFENDANTS

As Footnote One on Page Ten briefly discloses, one lawyer represented all Defendants throughout the trial and pretrial process.

At the final pretrial conference, I had a dialogue on the record with that lawyer, strongly suggesting that each Defendant be represented by separate counsel. I also told him that if there were not separate counsel, I would want a waiver of the apparent conflict of interest on the day trial commenced.

On the first day of trial I neglected to speak to the individual Defendants about the fact that only one lawyer appeared for all Defendants. The jury selection process and the beginning of the trial started before a trial incident occurred which dramatically reminded me of the counsel problem.

Plaintiff offered some "other incident" evidence under Rule 404(b), including notice evidence against Defendant City of Lansing, and against one individual, Defendant Kevin Moore. At that time, I excused the jury and took up the lawyer problem with all Defendants and their lawyer on the record. After explaining conflict generally and specifically referring to the proffered evidence, I recessed to allow Defendants to consider the dangers of joint representation.

I speculated, on the record, that perhaps the City had agreed to indemnify the individual officers and/or that insurance would cover their damages if any. I pointed out,

however, that reputations might have greater value than money, particularly in light of the proffered "other Incident" evidence, which was clearly not admissible against seven of eight individual Defendants. I suggested that individual lawyers would emphasize to the jury that the evidence was not admitted against their clients; that individual lawyers might move for severance, *etc* . . .

Following a recess, and some colloquy on the record, all Defendants, including the City, waived the apparent conflict. Despite their waiver, I told them I thought they were making a mistake, and that were I in their positions, I would insist on having my own lawyer. My concerns went unheeded, and I did not believe that I had the authority to order the officers to obtain counsel.

That single lawyer, obviously, was unable to deflect evidence from one or more of "his" clients, and as a result all of "his" clients were poorly represented. As an example, after the verdict, one of the officers informed the court of his bankruptcy, and moved the court for relief from the judgment. That motion is pending as this opinion is being penned. Did "his" trial lawyer even know of this bankruptcy?

As the evidence was introduced, it became obvious that Defendants' single lawyer had not assessed the value of the case, despite having lost a similar case for the same municipal client[4] and against the same lawyer with damages assessed exceeding one million dollars. As a consequence, an opportunity to settle the case was lost to the disadvantage of all of "his" clients.

The evidence of this lawyer's faulty assessment analysis can be gleaned from an ADR process (Michigan Mediation), from the comments of Plaintiff's counsel about "mock trials" conducted by the Plaintiff, and from the reaction of seven jurors in the instant case.

---

**4.** And one of the same corrections officers.

I write these words in utter dismay asking if waiver by clients, waives counsel's indifference. I also compose these words to alert future multiple parties to the dangers of single representation.

The cause of justice is not served by this kind of lawyer apathy and ineptitude.

### CONCLUSION

In the forty years since I graduated from law school, I have participated in many trials as a lawyer and as a judge. Never have I seen evidence more dramatic than in the instant case. Instead of the usual contradictory testimony about liability facts, this jury watched (many times) video evidence of the awful events that occurred in the last minutes of Edward Swans' life. In fact this jury apparently watched Swans die.

As if this were inadequate, the jury also witnessed Defendants' indifference as they first left Swans alone in his cell unattended, and then when they realized, belatedly, that he was dying or dead, they removed him from the cell of his death to another cell where they removed the "hog tie" restraints, and replaced them with less restrictive restraints[5]. This was all done on camera....and before attempting resuscitation.

Although counsel for the Defendants was unmoved by this drama, every nonparty in the courtroom, including sworn police officers now on security duty, was horrified. The jury's verdict reflects that horror.

This was almost a case of "justice denied" because, but for the video, there would have been no contradictory evidence to the testimony of the Defendants. Defendant City even tried to suppress or alter the Coroner's report. This should cause court observers to wonder how many similar cases went unproved without the awful, but truthful eye of the camera. In this case the camera cast a long shadow of shame on the Defendants and their counsel.

It is the oath of every United States Judge or Justice to "administer justice without respect to persons, and to do equal right to the poor and to the rich...." 28 U.S.C. § 453. This Court now upholds its oath in denying the Defendants' Motions and granting in part the Plaintiff's Motion for Costs and Attorney Fees. The verdict previously rendered by the jury does a small measure of justice to the memory of Edward Swans and to those bereft by his death. It also serves as a reminder to those that would trammel the rights of the poor and helpless that this is a nation of justice. These matters shall be ordered consistent with the Court's Opinion.

### ORDER

Consistent with the Court's Opinion of this date;

**IT IS HEREBY ORDERED** that the Defendants' Motion for Remittitur (Dkt.261), Motion for New Trial (Dkt. No. 268), and Motion for Judgment as a Matter of Law (Dkt.270) are **DENIED.**

**IT IS FURTHER ORDERED** that the Plaintiff's Motion for Costs and Attorney Fees (Dkt. No. 266) and Renewed Motion for Costs and Attorney Fees (Dkt. No. 276) are **GRANTED IN PART AND DENIED IN PART.** Plaintiff is awarded attorney fees pursuant to 42 U.S.C. § 1988 against the Defendants, jointly and severally, in the amount of Three Hundred Forty–Three Thousand Nine Hundred Fifty–Three Dollars and Seventy Cents ($343,-953.70) as of the date of this Order. As of the date of this Order, the Judgment previously entered is **AMENDED** to reflect the award of attorney fees and shall bear interest in accordance with federal law.

---

**5.** It is possible to perceive this "restraint switch" as an attempt to confuse or mask the cause of death issue. It was unworthy of the individual Defendants.